UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

HOH SYSTEMS, INC.
d/b/a HYDROTHANE SYSTEMS,

    Plaintiff,

v.

AFTERMARKET BUSINESS
CONSULTANTS, INC. d/b/a ABC, INC.,
ROBERT ROY CHEESMAN, and
HYDRO COMPONENT SYSTEMS, LLC,

    Defendants.

Civil Action No. 05 11059 RGS

RECEIPT # _64445_
AMOUNT $ _250.00_
SUMMONS ISSUED _3_
LOCAL RULE 4.1 _✓_
WAIVER FORM _✓_
MCF ISSUED _—_
BY DPTY. CLK. _M.P._
DATE _5/26/05_

**VERIFIED COMPLAINT**

**Parties**

1.    Plaintiff HOH Systems, Inc. d/b/a Hydrothane Systems ("Hydrothane") is a Delaware corporation with a principal place of business in Pembroke, Massachusetts.

2.    According to the Wisconsin Department of Financial Institutions, Defendant Aftermarket Business Consultants, Inc. ("ABC") is a Wisconsin corporation with a principal office at S26 W29056 Jarmon Road, Waukesha, Wisconsin 53183. Upon information and belief, Aftermarket Business Consultants, Inc. does business under the trade name ABC, Inc. and has a separate business location at 2108 Silvernail Road, Pewaukee, Wisconsin 53072.

3.    Upon information and belief, Defendant Robert Roy Cheesman ("Cheesman") is an individual who resides at S26 W29056 Jarmon Road, Waukesha, Wisconsin 53183. According to the Wisconsin Department of Financial Institutions, Cheesman is listed as the Registered Agent for ABC. On information and belief, at all relevant times hereto, Cheesman was the President of ABC.

4.      According to the Wisconsin Department of Financial Institutions, Defendant Hydro Component Systems, LLC ("HCS") is a Wisconsin limited liability company with a principal office at 319 Hart Street, Watertown, Wisconsin 53094.

## Jurisdiction and Venue

5.      This Court has jurisdiction pursuant to 15 U.S.C. § 1121, 28 U.S.C. §§ 1331, 1332, and 1338, and 35 U.S.C. §§ 154 and 271, and has supplemental jurisdiction pursuant to § 1367.

6.      Venue is proper under 28 U.S.C § 1391(a) because a substantial part of the events giving rise to this suit occurred within this judicial district and Defendants are otherwise subject to personal jurisdiction within this judicial district.  Venue also is proper under 28 U.S.C. § 1391(b) because Defendants are committing statutory violations and conducting activities that are causing substantial and irreparable injury to Hydrothane within this judicial district and, on information and belief, Defendants conduct business throughout the United States through the use of an interactive website, including within this judicial district.  Venue also is proper under 28 U.S.C. § 1400(b).

## Facts Common to All Counts

### Background

7.      Hydrothane manufactures and sells patented non-metallic trash racks that are used to filter intake water at power generating facilities and other such locations.

8.      On July 11, 1989, the United States Patent and Trademark Office duly and legally issued to Joseph Pastore ("Pastore"), Hydrothane's original founder, U.S. Patent No. 4,846,966, entitled "TRASH RACK" (the "'966 Patent"), a true and correct copy of which is attached hereto as **Exhibit A**.

9.      On July 13, 1999, the United States Patent and Trademark Office duly and legally issued to Pastore U.S. Patent No. 5,922,195, entitled "TRASH RACK WITH NON-METALLIC REINFORCING ROD" (the "'195 Patent"), a true and correct copy of which is attached hereto as **Exhibit B**.

10.     In 1999, Pastore sold Hydrothane to HOH Systems, Inc., and, as part of that sale, he assigned to HOH Systems, Inc. full right and title to both the '966 Patent and the '195 Patent. As a result, HOS Systems, Inc. d/b/a Hydrothane Systems is the assignee and owner of both the '966 Patent and the '195 Patent.

11.     HOH Systems, Inc. and its predecessors-in-interest have used the name "Hydrothane" continuously, for many years, and have developed common law trademark rights in that name in connection with the manufacture, marketing, and sale of trash racks.

12.     HOH Systems, Inc. continues to do business under the name Hydrothane and continues to use the patented technology of the '966 Patent and the '195 Patent.

13.     On or about August 27, 1999, ABC entered into a Marketing Agreement with Hydrothane, pursuant to which ABC acted as Hydrothane's Marketing Representative for its products and services in the United States. Cheesman signed the Marketing Agreement on behalf of, and as President of, ABC. A true and correct copy of the Marketing Agreement is attached hereto as **Exhibit C**.

14.     The Marketing Agreement contained a confidentiality provision that prevented ABC from disclosing any confidential information of Hydrothane, including but not limited to trade secrets, costs, manufacturing processes, and customer information.

15.     The Marketing Agreement contained a choice of law provision requiring that the agreement be interpreted under the laws of the Commonwealth of Massachusetts.

- 3 -

16.    During the business relationship with Hydrothane, Cheesman and ABC learned substantial confidential and proprietary information about Hydrothane, including but not limited to information about customers and potential customers, vendors, manufacturers, manufacturing processes and know-how, technology, and business strategy.

17.    During that time, Cheesman and ABC took photographs of projects worked on by Hydrothane, including photographs of installed trash racks and related systems.

18.    During that time, Cheesman and ABC were provided samples of the Hydrothane trash racks to show customers and potential customers.

19.    On information and belief, during that time, Cheesman and ABC were developing thoughts and ideas to open up a competing business to Hydrothane, to manufacture, market, and sell non-metallic trash racks.

20.    On or about August 24, 2001, ABC, by and through Cheesman, sent a letter to Hydrothane indicating an intention to terminate the Marketing Agreement and setting forth proposed terms for such a termination.

21.    In or around March 2002, Cheesman again expressed an intention to terminate the business relationship between ABC and Hydrothane. During discussions related to that termination, Cheesman agreed to return to Hydrothane all materials related to Hydrothane's business, including but not limited to literature, samples, databases, mailing lists, sales representative lists and correspondence, quote lists, and correspondence between ABC and Hydrothane (including emails).

22.    As of June 14, 2002, ABC had not returned to Hydrothane all of the materials identified above. As of that date, Cheesman had only returned certain databases and some

- 4 -

brochures. On or about June 14, 2002, Hydrothane sent a letter to Cheesman and ABC, requesting that the remaining materials be returned to Hydrothane.

23.     In response to the June 14, 2002 letter, Cheesman sent an empty box, and failed to return the requested materials.

24.     As of the date of this Verified Complaint, Cheesman still has refused to return confidential business information belonging to Hydrothane, including but not limited to sales records, product and component samples, certain databases (with information about quotes and both current and potential customers), correspondence with customers and/or sales representatives, material data sheets, specification sheets, information on Hydrothane suppliers, information on Hydrothane's intellectual property, and information on research and development.

25.     In or about the summer of 2002, Cheesman and ABC developed or helped to develop HCS, a competing business to Hydrothane.

26.     HCS is in the business of manufacturing, marketing, and selling non-metallic trash racks.

27.     In the course of that business, HCS has used and benefited from confidential and proprietary business information belonging to Hydrothane.

28.     On information and belief, Cheesman continues to market ABC as a distributor and/or representative of "Hydrothane" products.

29.     HCS operates an internet website, http://www.hydrocomponentsystems.com. On information and belief, HCS has used the term "hydrothane" on its internet website and/or in its meta-tag field to attract internet users looking for Hydrothane. Meta-tag keywords are hidden code that are inserted by a web page creator into a website's HTML code that are intended to

attract "hits" to that website through the use of an internet search engine. HCS has knowingly used this deceptive and misleading means of attracting Internet users to its website with the intent and purpose of persuading potential purchasers of Hydrothane products to purchase products from HCS instead of from Hydrothane.

30.    On its website, HCS also has a link to "Case Studies." The four case studies shown on the website are for (1) cooling tower screens and trash racks at a nuclear power plant in Illinois, (2) cooling tower intake screens at an undisclosed location, (3) an offshore intake screen at a nuclear power plant in Wisconsin, and (4) cooling tower screens and trash racks at a power plant in Texas. Each case study also is accompanied by detailed photographs of the various screens and trash racks.

31.    At least three of the case studies shown on HCS's website are actually of projects done by Hydrothane, not HCS, and the pictures on HCS's case studies reflect pictures taken of screens and trash racks manufactured, sold, and installed by Hydrothane, not HCS, including projects in Wisconsin and Illinois.

32.    Hydrothane contacted Cheesman's partner at HCS, Tom Reiss ("Reiss"), to demand that Hydrothane's confidential and proprietary business information be returned, that HCS cease and desist from using that information in the conduct of its business, and that HCS cease and desist from using pictures of Hydrothane projects on its website. Reiss responded that it is not his practice to do business in that manner and that HCS would stop any such practice.

**Count I**
**(Breach of the Marketing Agreement)**

33.    Hydrothane restates and reavers each and every allegation contained above, as if fully stated herein.

34.    During the course of their business relationship with Hydrothane, Cheesman and ABC had access to and used trade secrets and other confidential information belonging to Hydrothane, including but not limited to information concerning customers and potential customers, vendors, suppliers, manufacturers, distributors, sales representatives, correspondence with customers, potential customers and sales representatives, manufacturing processes, material data sheets, specification sheets, profit margins, mark ups, business strategies, sales techniques, merchandising and negotiating strategies, Hydrothane's intellectual property, research and development, and financial and other business information.

35.    The Marketing Agreement prohibited Cheesman and ABC from using Hydrothane's trade secrets and other confidential information to the detriment of Hydrothane and/or from disclosing that information to a third party.

36.    After terminating the business relationship with Hydrothane, Cheesman and ABC used and disclosed Hydrothane's trade secrets and confidential information for its financial gain, and to the detriment of Hydrothane.

37.    The conduct of Cheesman and ABC, as alleged herein, constitutes a breach of the Marketing Agreement.  As a result thereof, Hydrothane has been permanently and irreparably harmed.

## Count II
### (Breach of the Covenant of Good Faith and Fair Dealing)

38.    Hydrothane restates and reavers each and every allegation contained above, as if fully stated herein.

39.    Implicit in the Marketing Agreement was a covenant of good faith and fair dealing.

40.    The conduct of Cheesman and ABC, as alleged herein, constitutes a breach of the covenant of good faith and fair dealing implicit in the Marketing Agreement. As a result thereof, Hydrothane has been permanently and irreparably harmed.

## Count III
### (Misappropriation of Trade Secrets and Confidential Information)

41.    Hydrothane restates and reavers each and every allegation contained above, as if fully stated herein.

42.    During the course of their business relationship with Hydrothane, Cheesman and ABC had access to and used trade secrets and other confidential information belonging to Hydrothane, including but not limited to information concerning customers and potential customers, vendors, suppliers, manufacturers, distributors, sales representatives, correspondence with customers, potential customers and sales representatives, manufacturing processes, material data sheets, specification sheets, profit margins, mark ups, business strategies, sales techniques, merchandising and negotiating strategies, Hydrothane's intellectual property, research and development, and financial and other business information.

43.    After terminating the business relationship with Hydrothane, Cheesman and ABC used and disclosed Hydrothane's trade secrets and confidential information for its financial gain, and to the detriment of Hydrothane.

- 8 -

44.     All of the Defendants have used and continue to use Hydrothane's trade secrets

and confidential information for their benefit and to Hydrothane's detriment.

45.     By their actions, Defendants have misappropriated Hydrothane's trade secrets and

confidential information, and have violated M.G.L. c. 93, §§ 42 and 42A. As a result thereof,

Hydrothane has been permanently and irreparably harmed.

## Count IV
### (Breach of Loyalty and Fiduciary Duty)

46.     Hydrothane restates and reavers each and every allegation contained above, as if

fully stated herein.

47.     Cheesman and ABC occupied positions of trust and confidence with Hydrothane

and owed Hydrothane a duty of loyalty and a duty to protect Hydrothane's trade secrets and

confidential information, goodwill, and other business interests.

48.     Cheesman and ABC violated their duty of loyalty and fiduciary duty to

Hydrothane by misappropriating Hydrothane's trade secrets and confidential information to start

a competing business.

49.     The conduct of Cheesman and ABC, as alleged herein, constitutes a breach of the

duty of loyalty and a breach of the fiduciary duty owed to Hydrothane. As a result thereof,

Hydrothane has been permanently and irreparably harmed.

## Count V
### (Quantum Meruit and Unjust Enrichment)

50.     Hydrothane restates and reavers each and every allegation contained above, as if

fully stated herein.

51.     Cheesman and ABC breached the confidentiality provision in the Marketing

Agreement and Defendants have otherwise misappropriated trade secret and other confidential

information belonging to Hydrothane, for their unjust financial gain and to the detriment of Hydrothane.

52.     Defendants have been unjustly enriched from their actions, as alleged herein. As a result thereof, Hydrothane has been permanently and irreparably harmed.

## COUNT VI
### (Unfair Competition, False Advertising and False Designation of Origin)

53.     Hydrothane restates and reavers each and every allegation contained above, as if fully stated herein.

54.     Defendants know, or should know, that they are committing acts of untrue and misleading advertising and that they are misleading the public into believing that HCS has performed work actually performed by Hydrothane and that ABC has a continuing business relationship with Hydrothane.

55.     Defendants have engaged in the above acts and practices, and continue to act in that manner, with the intent to induce members of the public to purchase HCS products instead of Hydrothane products.

56.     The above acts and practices of untrue and misleading advertising present a continuing threat to Hydrothane and to members of the public.

57.     Defendants' conduct, as alleged herein, constitutes unfair competition, false advertising, and false designation of origin under 15 U.S.C. § 1125(a). As a result thereof, Hydrothane has been permanently and irreparably harmed.

## COUNT VII
### (Common Law Unfair Competition and Trademark Infringement)

58.     Hydrothane restates and reavers each and every allegation contained above, as if fully stated herein.

59.     Hydrothane has generated substantial goodwill and thereby acquired common law trademark rights in and to the Hydrothane mark.

60.     Defendants have deliberately adopted and used, and continue to use, the Hydrothane mark on the HCS internet website and/or in its meta-tag field to attract hits to the HCS website by internet users looking for Hydrothane and by representing to customers and potential customers that ABC has a continuing business relationship with Hydrothane.

61.     Defendants' conduct, as alleged herein, constitutes unfair competition and infringement of Hydrothane's common law rights to the use of the Hydrothane trademark. As a result thereof, Hydrothane has been permanently and irreparably harmed.

## Count VIII
### (Infringement of the U.S. Patent No. 4,846,966)

62.     Hydrothane restates and reavers each and every allegation contained above, as if fully stated herein.

63.     Hydrothane is the owner by assignment of all right, title, and interest in and to the '966 Patent, and thus has the exclusive right to make, use, offer for sale, and sell trash racks embodying the invention of the '966 Patent.

64.     Defendants have actual and/or constructive notice of the '966 Patent.

65.     Defendants have infringed and continue to infringe the '966 Patent, by making, using, offering to sell, and/or selling trash racks embodying the invention of the '966 Patent, without authorization, in this judicial district and elsewhere, and will continue to do so unless enjoined by this Court.

66.     Defendants' actions, as alleged herein, constitute an infringement of the '966 Patent under 35 U.S.C. § 271.

67.    Hydrothane has been damaged by Defendants' infringing activities, and will be irreparably injured unless such infringing activities are enjoined by the Court.

68.    Defendants' infringement of the '966 Patent has been, and continues to be, willful, making this case exceptional under 35 U.S.C. § 285 and warranting an award of treble damages under 35 U.S.C. § 284.

### Count IX
### (Infringement of the U.S. Patent No. 5,922,195)

69.    Hydrothane restates and reavers each and every allegation contained above, as if fully stated herein.

70.    Hydrothane is the owner by assignment of all right, title, and interest in and to the '195 Patent, and thus has the exclusive right to make, use, offer for sale, and sell trash racks embodying the invention of the '195 Patent.

71.    Defendants have actual and/or constructive notice of the '195 Patent.

72.    Defendants have infringed and continue to infringe the '195 Patent, by making, using, offering to sell, and/or selling trash racks embodying the invention of the '195 Patent, without authorization, in this judicial district and elsewhere, and will continue to do so unless enjoined by this Court.

73.    Defendants' actions, as alleged herein, constitute an infringement of the '195 Patent under 35 U.S.C. § 271.

74.    Hydrothane has been damaged by Defendants' infringing activities, and will be irreparably injured unless such infringing activities are enjoined by the Court.

75.    Defendants' infringement of the '195 Patent has been, and continues to be, willful, making this case exceptional under 35 U.S.C. § 285 and warranting an award of treble damages under 35 U.S.C. § 284.

- 12 -

## Count X
### (Tortious Interference with Contracts and Advantageous Business Relations)

76.     Hydrothane restates and reavers each and every allegation contained above, as if fully stated herein.

77.     Hydrothane has contracts and advantageous business relations with its customers and potential customers.

78.     Defendants have used false advertising, trademark infringing activities, patent infringing activities, and misappropriated trade secret and confidential information to solicit and to gain business from actual and potential customers of Hydrothane.

79.     By their actions, as alleged herein, Defendants have taken business away from Hydrothane and have injured Hydrothane's goodwill with those customers and potential customers.

80.     Defendants have acted, and continue to act, without lawful justification.

81.     By their actions, alleged herein, Defendants have acted with improper motive and/or improper means in their intentional interference with Hydrothane's customer contracts and with its actual and prospective business relationships.

82.     The conduct of Defendants, as alleged herein, constitutes tortious interference with Hydrothane's customer contracts and advantageous business relations. As a result thereof, Hydrothane has been permanently and irreparably harmed.

## Count XI
### (Violation of M.G.L. c. 93A, §§ 2 and 11)

83.     Hydrothane restates and reavers each and every allegation contained above, as if fully stated herein.

84.    Defendants are each a "person" and are engaged in "trade or commerce" within the meaning of M.G.L. c. 93A.

85.    Hydrothane is a "person" and is engaged in "trade or commerce" within the meaning of M.G.L. c. 93A.

86.    The conduct of Defendants, as alleged herein, constitutes willful and knowing violations of M.G.L. c. 93A, §§ 2 and 11.  As a result thereof, Hydrothane has been permanently and irreparably harmed.

WHEREFORE, Plaintiff HOH Systems, Inc. d/b/a Hydrothane Systems prays that Court find in its favor on all counts herein and order the following relief:

1.    enter judgment that Defendants Cheesman and ABC have breached the Marketing Agreement, have breached the implied covenant of good faith and fair dealing implicit in the Marketing Agreement, and have breached their duty of loyalty and other fiduciary duties;

2.    enter judgment that all Defendants have misappropriated Hydrothane's trade secrets and confidential business information;

3.    issue a preliminary and permanent injunction ordering all Defendants not to use, distribute, disclose, or disseminate trade secrets and confidential information belonging to Hydrothane and ordering all Defendants to return all trade secrets and confidential information (hard copy and electronic) belonging to Hydrothane, including information concerning customers and potential customers, vendors, suppliers, manufacturers, distributors, sales representatives, correspondence with customers, potential customers and sales representatives, manufacturing processes, material data sheets, specification sheets, profit margins, mark ups, business strategies, sales techniques, merchandising and negotiating strategies, Hydrothane's intellectual property, research and development, and financial and other business information;

4.    enter judgment that all Defendants have tortiously interfered with customer contracts and advantageous business relations of Hydrothane;

5.    enter judgment that Defendants' actions constitute unfair competition, false advertising, false designation of origin, and trademark infringement;

6.    issue a preliminary and permanent injunction ordering all Defendants not to solicit or transact business with customers and/or potential customers known

through the use of Hydrothane's trade secrets or confidential business information and/or solicited through Defendants' false and misleading advertising, unfair competition, or trademark infringement;

7.    enter judgment that all Defendants have been unjustly enriched by their conduct, as alleged herein;

8.    enter judgment that Defendants have infringed the '966 Patent, that such infringement was willful, and that such conduct subjects Defendants to compensatory and treble damages, pursuant to 35 U.S.C. § 284, and attorneys' fees, costs, and interest, pursuant to 35 U.S.C. § 285;

9.    issue a preliminary and permanent injunction ordering all Defendants not to infringe, directly or indirectly, the '966 Patent;

10.    enter judgment that Defendants have infringed the '195 Patent, that such infringement was willful, and that such conduct subjects Defendants to compensatory and treble damages, pursuant to 35 U.S.C. § 284, and attorneys' fees, costs, and interest, pursuant to 35 U.S.C. § 285;

11.    issue a preliminary and permanent injunction ordering all Defendants not to infringe, directly or indirectly, the '195 Patent;

12.    order an accounting of profits by Defendants stemming from the sale of trash racks from 2001 through the present, and enter judgment in favor of Hydrothane and against all Defendants for all damages suffered by Hydrothane, as may be calculated at trial, plus interest, attorneys' fees, and costs;

13.    award treble damages and attorneys fees and costs, as permitted under M.G.L. c. 93A, §§ 2 and 11; and

14.    Grant such other and further relief as may be just and proper.

HOH SYSTEMS, INC. d/b/a
HYDROTHANE SYSTEMS,

By its attorneys,

Dated:  May 20, 2005

Jason W. Morgan (BBO #633802)
Michael D. Williams (BBO #654149)
DROHAN, HUGHES, TOCCHIO & MORGAN, P.C.
175 Derby Street, Suite 30
Hingham, MA 02043
Tel:  (781) 749-7200
Fax:  (781) 740-4335

- 15 -

## **VERIFICATION**

I, J. Matthew Brown, President of HOH Systems, Inc. d/b/a Hydrothane Systems, have read the allegations contained in this Verified Complaint and hereby verify that the factual statements contained herein are true and correct, except for those stated to be on information and belief, which I believe to be true.

J. Matthew Brown

# EXHIBIT A

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

November 03, 1998

THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *4,846,966*
ISSUE DATE: *July 11, 1989*



By Authority of the

COMMISSIONER OF PATENTS AND TRADEMARKS

MARGARET BASSFORD
Certifying Officer

# United States Patent [19]

## Pastore

[11]  Patent Number:  **4,846,966**

[45]  Date of Patent:  **Jul. 11, 1989**

[54]  **TRASH RACK**

[76]  Inventor:  Joseph Pastore, 250 Foreside Rd., Cumberland, Me. 04021

[21]  Appl. No.: 245,282

[22]  Filed:  Sep. 16, 1988

[51]  Int. Cl.⁴ ..................... B01D 35/02; B01D 35/30
[52]  U.S. Cl. ...................................... 210/153; 210/154; 210/162; 210/170; 210/486; 210/488; 428/160
[58]  Field of Search ........ 210/153, 154, 155, 158–159, 210/160, 162, 163, 166, 170, 486, 488; 405/52, 75, 78; 290/52, 53, 54; 428/160; 156/198

[56]  **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,930,485 | 3/1960 | Nordell | 210/159 |
| 4,045,350 | 8/1977 | Kupf et al. | 210/486 |
| 4,229,304 | 10/1980 | Fisher | 210/486 |
| 4,326,819 | 4/1982 | Atencid | 290/53 |
| 4,430,142 | 2/1984 | Ochi et al. | 156/198 |
| 4,521,306 | 6/1985 | Day | 210/163 |
| 4,540,313 | 9/1985 | Broome | 290/52 |
| 4,594,024 | 6/1986 | Jenkner et al. | 210/154 |
| 4,746,244 | 5/1988 | Broome | 290/52 |
| 4,790,935 | 12/1988 | Johnson | 210/486 |
| 4,793,928 | 12/1988 | Tsukamoto et al. | 210/486 |

### OTHER PUBLICATIONS

Parkinson, "Frazil Ice Problems at Trash Racks," Winter Operation–Ice Problems, Montreal, Aug. 1987, pp. 1–10.

*Primary Examiner*—Richard V. Fisher
*Assistant Examiner*—Joseph Drodge
*Attorney, Agent, or Firm*—Thomas L. Bohan

[57]  **ABSTRACT**

Injection-molded intake-water filtering apparatus designed for use with electric power generating stations and the like, comprising a rectangular elastomeric grid in which the number and spacing of the longitudinal elements are both adjustable. The lateral spacing between the longitudinal elements is established by cylindrical sleeves through which pass transverse rods which bind together the longitudinal elements to form the grid. The elastomeric material used is of a hardness, strength, and elasticity necessary to resist the large forces to which the trash rake is exposed and sufficiently smooth that ice-nucleating centers and marine-growth anchors are effectively absent on the surface of the finished grid.

8 Claims, 1 Drawing Sheet



U.S. Patent          Jul. 11, 1989          4,846,966



FIG. I

FIG. IA

FIG. IB

FIG. 2

4,846,966

1

# TRASH RACK

## BACKGROUND OF THE INVENTION

### 1. TECHNICAL FIELD

My invention relates to grating apparatus designed to provide a relatively lightweight, maneuverable, and ice- and barnacle-repellent means of filtering the intake water needed by electric power generators and other systems demanding a large flow of water from a reservoir.

### 2. BACKGROUND ART

Power generating systems, be they fossil-fueled, nuclear-based, or hydro-electric, are dependent on an non-interruptable source of water. In general, water intake requirements for public utilities and private factories—especially those within the pulp and paper industry—which incorporate such generators amount to thousands of gallons of water a minute or more. Depending on the application, this demand may alternate with no water flow at all for a period of time. Nearly without exception this water is drawn from some type of open reservoir: lake, river, ocean. In part because of the flow rate of the water drawn in for this purpose, such operations have long been plagued by problems of trash and marine organism entrainment. As initial filtration to eliminate trash, large gratings of one sort or another have been placed at the point where the water first enters the system. The purpose of these initial filters, often referred to as "trash racks," is to allow nearly free flow of water while at the same time intercepting the larger components of water-borne debris. These trash racks have traditionally been made of steel, with typical dimensions of 2–3 feet by 20 feet, and oriented so that their long dimension is nearly vertical. Within the trash rack frame, there are a series of closely spaced longitudinal steel members, typically of dimensions ¼"×6"×20'. In this way the trash rack constitute a highly "porous" interface between the reservoir and the water intake tunnel leading to the generator. It also constitutes a very heavy filter, given its dimensions and the specific gravity of steel: 7.2.

The tops o the nearly-vertical trash racks often extend to the water's surface. This results in the in-flowing water coming from reservoir depths ranging from zero down 18–20 feet. Under other circumstances the entire ⅛th of the racks may be placed far under the reservoir water's surface. This includes circumstances where the racks or their equivalent are placed horizontally on the reservoir bottom.

The trash rack arrangement described above, though dominant within the industry, has been fraught with problems, and for at least 100 years operators and builders of electric power generators—indeed all systems requiring a high flow of water intake—have experimented with variations on the basic trash rack designs as well as with accessories as to be discussed below. These problems—which are inter-related—include: (1) the great weight associated with steel gratings of the size required; (2) the need for periodic painting and other maintenance, including the removal of marine organisms, especially barnacles; (3) the formation of flow-interrupting ice on those gratings located in northern regions.

The problems are inter-related in the sense that the great weight of the steel trash racks becomes particularly onerous the more frequently these racks have to be removed for maintenance or replacement. In order to

2

prevent the steel from oxidizing (corroding) at a high rate (especially in salt water, where they are often placed), a paint coat must be maintained on the trash racks. This in turn is made more difficult because of the necessity to periodically rake the surface of the racks in order to remove debris which has collected and barnacles which have grown and which together impede the flow of water.

In recent years, the environmental protection prohibitions placed on the use of barnacle-repelling paints have worsened this problem, in the sense that it increases the frequency with which steel trash racks need to be rid of barnacles and the like. Because of the gratings' weight, typically equalling several thousand pounds, their removal is not a trivial undertaking. Because of the function they fulfill, they are commonly located so that placement and removal cannot be accomplished directly from land but must be done from a barge anchored just in front of the water intake point, a requirement which introduces many additional complications. In addition to the periodic pulling of the trash racks for maintenance, there is much effort devoted to their cleaning while they are submerged. This in situ cleaning involves various jury-rigged scrappers and brushes being hauled across the trash racks from above, something which tends to damage the racks' protective paint covering, hastening the need for removal and re-painting—especially where sea water immersion is involved.

A more subtle but potentially much more disastrous problem is ice formation on the grating. The consequences of such formation can range from an interruption of power output up to and including the destruction of the generator. (Depending on the particular circumstances, an intermediate level of damage can be the destruction of the trash rack.)

Contrary to common belief, ice can form on or accumulate on objects beneath the water without being linked to surface ice. Although the distinctions are sometimes blurred, the ice forming on submerged structures such as trash racks can be categorized as either anchor ice or frazil ice. The former depends upon a "supercooling" of the water below its normal freezing point in the vicinity of the underwater objects. It also depends for its formation on the presence of nucleation sites at which the initial crystallization of ice from the supercooled water can occur. Frazil ice build-up on the other hand commences with the adherence of already-frozen crystallites which are borne by the water flow. These crystallites may have formed near the surface of an open reservoir (even in the coldest weather it is possible for parts of the reservoir surface to remain open if the water is sufficiently turbulent) and then been pulled down by the flow pattern of the water. Given the right circumstances, frazil ice can arise and completely block off the flow of intake water in a fraction of an hour. Because of its dependence on the entrainment of crystallites, the frazil ice formation is favored by high flow rates, as well as by sub-freezing water temperatures (which enhance the "stickiness" of the crystallites). On the other hand, anchor ice as defined above generally requires still water for its formation, and may only be a problem in those trash racks involved in the on-and-off flow associated with "as needed" operation of the power generator.

The trash rack icing problem has given rise to a diversity of ad hoc solutions. These range from heating the

4,846,966

3

vicinity of the intake so as either to melt the ice crystal-lites or to heat the racks up to a temperature where the crystallites will not adhere to the trash rack surfaces. This approach is not cost-free even in those installations where there is "waste" heat carried off. Another tech- 5 nique is to cavitate the water in the vicinity of the trash racks, that is, to introduce hypersonic vibrations. The resulting vibrations make it more difficult for ice to form or adhere to the rack surfaces. Some opera-tions periodically direct air guns at the racks to dislodge 10 ice; a related approach is to connect a transducer to the metal racks with which to introduce periodic hyper-sonic vibrations so as to interrupt the icing of frazil ice and to dislodge that ice which has adhered.

Yet another approach in the battle with icing at the 15 water intake is to locate the water intake at great depths below the surface, at depths below which the frazil ice is thought to form. Although there is some controversy about the existence of such a frazil ice cut-off depth, many workers believe that at a depth greater than 30 20 feet the water is free of frazil ice crystallites regardless of the air temperature. Thus, by placing the intake filter on the bottom of a sufficiently deep reservoir and ori-enting it horizontally—as is taught by Jenkner et al. in "Offshore Intake Structure," U.S. Pat. No. 4,594,024— 25 one might escape the icing problem. It has to be noted that just placing the intake system below the putative cut-off depth is not enough, since water is drawn in from a considerable height above the bottom. For ex-ample, if one allows a typical height of 15 feet for this 30 in-drawing and accepts the 30-foot figure for frazil cut-off, the intake filter must be located on the bottom of a reservoir in greater than 45 feet of water. (Other work-ers have reported frazil ice blockage of a horizontal intake at a reservoir depth of 55 feet, though there is no 35 estimate of the thickness of the horizontal layer from which the intake water was being drawn at the time.)

For a recent discussion of the trash rack icing prob-lem and the range of attempted solutions, see "Frazil Ice Problems at Trash Racks," a paper delivered by 40 F.E. Parkinson at the August, 1987, conference: Hydro Operation and Maintenance: Winter Operation—Ice Problems [sponsored jointly by the Canadian Electrical Association, the Electric Power Research Institute, and Hydro Quebec]. This paper also refers to an 1888 engi- 45 neering publication dealing with the formation of frazil ice at water intakes in northern climes—an indication of the duration of time over which a solution to the prob-lem has been sought.

All of the prior approaches to ridding the intake 50 system of the icing problem introduce significant costs of their own, in terms of out-of-pocket expenses—e.g., for cavitation—or in terms of the severe constraints they impose on the design options available. One often does not have a choice as to what depth and at what 55 orientation one is going to place the water intake point. Thus, it is seen that a simple means limited to the rack itself of reducing the icing problem and one which also makes the racks more durable and more maneuverable constitutes a significant improvement over the prior art. 60 My invention consists of trash racks constructed en-tirely or nearly entirely of impact- and abrasion-resist-ant elastomers which are extremely smooth and of great hardness. Because of their effective lack of nucleation sites, these racks will not collect anchor ice and also will 65 greatly retard if not prevent completely the adherence of frazil ice. Because of its strength, the elastomeric material used can be formed into trash racks of the same

4

dimensions (and, consequently, the same porosities) as the traditional steel racks. Furthermore, its density about 1/6 that of steel results in racks which are about 1/6 the weight of the steel ones they replace. It is only recently that the material has been developed which would permit the mold-casting of very hard elastomers into the large elements needed for the racks. The largest elements are the longitudinal members, which can be cast from elastomers, in particular, polyurethane, with a resulting hardness of 75–95 D on the Shore Durometer scale.

The only prior approach of which I am aware that would make use of the ultra-smooth non-sticky surfaces available from certain elastomers involves coating tradi-tional steel racks with thin elastomer films. Experience to date has shown that this material is easily torn, allow-ing the underlying ferrous metal to corrode and also providing additional ice-formation and barnacle-attach-ment sites. Attention is called to U.S. Pat. Nos. 4,594,024 and 4,521,306, and to "Frazil Ice Problems at Trash Racks," op.cit., "Solving icing problem at power plant intakes," by Y.G. Mussalli and B. Budziak, pp. 58–59, Power Engineering, August, 1981, and "Frazil Ice Control Using Electromechanical Vibrators and Ice-Resistant Coatings," by Y.G. Mussalli, L.S. Gordon, and S.F. Daly, pp. 1568–1576 in WATERPOWER '87, Brian W. Clowes, editor (1987).

## SUMMARY OF THE INVENTION

The present invention is basically the application of newly-developed elastomeric material to the fabrication of water-intake trash racks, wherein the shift in materi-als from those used traditionally retards the accumula-tion of barnacles and other marine organisms, repels the formation of ice which tends to block water intake in cold climates, and simultaneously effects an increase in rack maneuverability and durability. The resistance to barnacle accumulation and ice formation depends on the much smoother surface presented by the new mate-rial compared to that of the ferrous metals used for traditional racks. Instead of applying an elastomer coat-ing to traditional steel trash racks, something which does not provide a lasting solution to the problem and which also does not address the maneuverability prob-lem, the present invention involves constructing the entire trash rack—the linking elements as well as the vertical members—from strong, lightweight elastomer, especially polyurethane. In addition, the use of solid plastic vertical members allows the leading edge of the grating to be easily shaped for the reduction of turbu-lence resulting from the passage of the intake water. This in turn reduces the pump power needed to main-tain the requisite flow rate of intake water and increases the net operating efficiency of the power generator.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a partially "blown-up" view of the trash rack.

FIG. 1a shows the internal construction of the rods.

FIG. 1b shows the formed edges of the longitudinal elements.

FIG. 2 is a stylized representation of family of trash racks at the cooling water intake of a nuclear power reactor.

## PREFERRED EMBODIMENT

The drawings depict the preferred embodiment of the invention. For definiteness, certain geometrical propor-

4,846,966

5

tions are utilized in these drawings; the proportions chosen are not meant in any way as limiting constraints on the subject matter claimed. For example, the drawings show a rectangular trash rack for which the ratio of the length to width is about 11:1 and which is oriented nearly vertically. In practice, the trash rack may be of any shape and, depending on the particular location of the intake tunnel, may have any orientation. Furthermore, although (for illustrative purposes), the trash rack is shown in association with a nuclear-fueled power generator, claim is made to the use of this type of trash rack for filtering in all situations where a large flux of water from a external source is to be filtered.

FIG. 1 is a partially exploded view of the trash rack 1 showing: a plurality of longitudinal elements 2 solid except for periodic circular openings 3; a plurality of transverse rods 4 with threaded ends 5 which link together said plurality of longitudinal elements 2; a plurality of spacers 6 concentric with said rods 4 which establish and maintain the mutual separation of said plurality of longitudinal elements 2; a plurality of washer pairs 7 located at the respective ends of and concentric with said rods 4; and a plurality of nut pairs 8 which screw onto said ends 5 of said rods 4 so as to fasten the entire trash rack 1 assemblage together.

Additionally in the preferred embodiment and as shown in FIG. 1a, said transverse rods 4 consist of a composite coaxial structure that comprises a central core 12 of cast thermoset plastic or steel surrounded by a cylindrical sleeve 13 formed of polyurethane of hardness 80 on the D scale. Said composite ensures that said rods 4 have both stiffness (provided by core) and strength and toughnsss (provided by polyurethane sleeve).

FIG. 1b shows a cross section of longitudinal elements 2, wherein the beveling on the leading edges 9 of said longitudinal elements 2 is provided as a means of reducing the turbulence introduced into the intake water by the presence of said trash racks 2.

FIG. 2 is a stylized depiction of an array 10 of said trash racks 1 in place at the water intake of an electric power generator. In this view said array 10 is shown partially above and partially below the water surface 11, as might be the case where the intake water reservoir is a tidal basin.

The basic invention consists of adapting to the manufacture of trash racks an elastomeric material newly-available for the cast-molding of objects as large as said longitudinal elements 2. In the preferred embodiment: said longitudinal elements 2 are cast-molded from polyether-based polyurethane of hardness 80–95 on the Shore D durometer scale; said washers 7 are cast of polyurethane of hardness 80 on the Shore D durometer scale; said nuts 8 are cast-molded from polyurethane of hardness 80–95 on the Shore D scale.

The polyurethane used for all the above elements has pigmentation and ultra-violet inhibitors added as a means of increasing the resistance of the finished elements to any deleterious photo-effects resulting from the trash racks' continual exposure to sunlight.

In the preferred embodiment, the mutual separation of said longitudinal elements 2 and also the longitudinal distribution of said transverse rods 4 can be varied, the former by the length chosen for said spacers 6, the latter by the longitudinal positioning chosen for said periodic circular openings 3 in said longitudinal elements 2. The location of said circular openings 3 is easily established

6

during the cast-molding of said longitudinal elements z by the placement of plugs at strategic locations in the mold prepared for the casting.

I claim:

1. Trash rack apparatus for filtering intake water for use with power generators comprising:
  (a) a plurality of longitudinal elements made of an elastomeric material;
  (b) elastomeric means for establishing lateral spacing between said longitudinal elements; and
  (c) means for linking said longitudinal elements together in a parallel fashion so as to form a stable grid,

wherein the means for linking comprises a plurality of rods, each rod having an internal core, made of a strong rigid material, and an external layer, coaxial with said internal core, made of an elastomeric material, wherein said rods span each space between said longitudinal elements and connect said longitudinal elements rigidly to one another to form the stable grid.

2. Apparatus as claimed in 1, wherein said internal core comprises cast thermoset plastic.

3. Apparatus as claimed in 1, wherein said elastomeric material comprises polyether-based polyurethane.

4. Track rack apparatus for filtering intake water for use with power generators comprising:
  (a) a plurality of longitudinal elements made of an elastomeric material;
  (b) elastomeric means for establishing lateral spacing between said longitudinal elements; and
  (c) means for linking said longitudinal elements together in a parallel fashion so as to form a stable grid, wherein said means for linking comprises a plurality of rods, each rod having an internal core made from a strong rigid material and an external coaxial layer made of an elastomeric material, wherein said rods span each space between the longitudinal elements and connect the longitudinal elements rigidly to one another to form the stable grid;

wherein said means for linking comprises a plurality of rods and associated elastomeric washers and nuts, wherein each said rod is cylinder, externally threaded at its two extremities, wherein each rod passes serially through said longitudinal elements and is coupled to said elastomeric washers and nuts so that said longitudinal elements lie between said elastomeric washers and nuts.

5. Apparatus as claimed in 4, wherein each of said longitudinal elements has a bottom a top, a front, a back, and two side faces, the long dimension of said side faces defining the length of said longitudinal elements, the short dimension of said side faces defining the width of said longitudinal elements, and the distance between said side faces defining the thickness of said longitudinal elements, and such that the front of said grid is defined by the collective fronts of said longitudinal elements the front of said grid defining a surface which said intake water flow first contacts.

6. Apparatus as claimed in 5, wherein the front of each said longitudinal element is formed so as to present a smooth contour to a flow of said intake water.

7. Apparatus as claimed in 6, wherein said internal core comprises cast thermoset plastic.

8. Apparatus as claimed in 7, wherein said elastomeric material comprises polyether-based polyurethane.

* * * * *

# EXHIBIT B

US005922195A

# United States Patent [19]

## Pastore

[11] **Patent Number:** 5,922,195

[45] **Date of Patent:** Jul. 13, 1999

[54] **TRASH RACK WITH NON-METALLIC REINFORCING ROD**

[76] Inventor: **Joseph Pastore**, 2816 W. Crowne Point Blvd., Naples, Fla. 39104

[21] Appl. No.: **08/944,283**

[22] Filed: **Oct. 6, 1997**

[51] Int. Cl.⁶ ............................. **E02B 5/08; B01D 39/14; B01D 39/16; B01D 29/03**

[52] U.S. Cl. .......................... **210/154;** 210/162; 210/232

[58] Field of Search ...................................... 210/162, 154, 210/170, 232

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 1,984,891 | 12/1934 | Miick . |
| 2,996,189 | 8/1961 | Salterbach . |
| 4,582,601 | 4/1986 | Strow . |
| 4,645,598 | 2/1987 | Hannum . |

4,846,966   7/1989   Pastore .

FOREIGN PATENT DOCUMENTS

7-300837   11/1995   Japan .

*Primary Examiner*—Thomas M. Lithgow
*Attorney, Agent, or Firm*—Allen D. Brufsky

[57] **ABSTRACT**

A trash rack for filtering large volumes of intake water generally of the type available to power-generating facilities. The trash rack includes reinforcing rods fabricated of non-metallic materials in a pultrusion fabrication process. The pultruded reinforcing rods are substantially lighter than prior steel reinforcing rods. The pultruded rods are flexible enough to give under impact and high-loading without fracture or permanent distortion, yet are strong enough to withstand the type of loading commonly experienced by such large-volume trash racks.

**10 Claims, 2 Drawing Sheets**





FIG. 1

FIG. 2

10

U.S. Patent    Jul. 13, 1999    Sheet 2 of 2    5,922,195



FIG. 3

5,922,195

**1**

## TRASH RACK WITH NON-METALLIC REINFORCING ROD

### BACKGROUND OF THE INVENTION

#### 1. Field of the Invention

The present invention relates to devices for gross filtering of intake water needed by systems demanding a large flow of water free of large-sized debris. More particularly, the present invention relates to grates or trash racks fabricated with structural reinforcement for the strengthening of non-metallic members exposed to the water. The present invention includes a fiber-reinforced material formed in the shape of a rod as the reinforcing component of the trash rack.

#### 2. Description of the Prior Art.

For many years, water intake systems have been filtered using trash racks made of metal, steel in particular. More recently, there has been increasing interest in the use of trash racks made substantially of non-metallic materials. The inventor of the present invention obtained U.S. Pat. No. 4,846,966 on Jul. 11, 1989 (the Pastore patent) for such an improvement in trash rack design. The advantages of using non-metallic materials are described in that patent. The disclosure made in the Pastore patent regarding the deficiencies in the prior metal trash racks, and the disclosure of the advantages of fabricating the longitudinal members of a non-metallic materials, are incorporated herein by reference.

Of particular concern to the present invention is the means for reinforcing the longitudinal elements of the Pastore non-metallic trash racks. Specifically, it is noted that Pastore teaches in his preferred embodiment the use of a coaxial structure including a central core of cast thermoset plastic or steel surrounded by a cylindrical sleeve. While that design is suitable, provided the steel central core is isolated from direct contact with water, it may be more complex than required. In addition, testing conducted subsequent to the grant of that patent indicates that cast thermoset plastic alone as the reinforcing component was too brittle to withstand the various significant static and dynamic loading applied to the trash racks. As a result, cast thermoset plastic was replaced with steel rods as the core in the Pastore trash racks.

It was also discovered that the non-metallic spacers used to space the longitudinal members of the rack apart were sufficient to isolate the steel reinforcing rod from water. It was determined that steel could be used to increase the structural integrity of the non-metallic racks without express concern as to ice and marine growth—provided the steel was not directly contacted by the water. However, as noted in the Pastore patent, steel has a much higher density than non-metallic materials. Therefore, although the Pastore trash rack is formed substantially of non-metallic materials and is therefore of much lighter weight than equivalently-sized prior metal trash racks, the continuing use of steel makes these racks heavier than they otherwise may be. Given the sizes of the trash racks—they may span rivers several hundred yards wide and wider—it would be advantageous to reduce their weight, but without detrimental effect on their usefulness.

A concern that has been discovered in using steel reinforcing rods is that steel does not have the "give" or flexibility to bounce back under high impact conditions. That is, when significantly-sized debris—such as a log or a dense pack of frazil ice—contacts the rack, it forces the rack to bend. Upon removal of that load, the rack may well remain contorted because the bent steel used to reinforce the longitudinal members will not rebound. Although steel has some small degree of elasticity, it is not sufficiently elastic,

**2**

or flexible, to recover from some of the types of loads experienced by trash racks. Therefore, the use of steel rods, while aiding to strengthen the substantially non-metallic trash racks, may result in undesirable failure under some conditions. The distortion that may occur would require premature replacement or significant maintenance activities.

What is needed is a non-metallic trash rack that filters coarse debris at the intakes of power generating systems and other systems requiring large amounts of water. What is also needed is a non-metallic trash rack that is as light weight as possible. Further, what is needed is a non-metallic trash rack that will recover to substantially its original shape upon removal of a load of the type commonly associated with trash racks for large volume water intakes. Still further, what is needed is such a trash rack that will not fracture upon being impacted by debris or ice of the type associated with such systems.

### SUMMARY OF THE INVENTION

It is an object of the present invention to provide a non-metallic trash rack that filters coarse debris at the intakes of power generating systems and other systems requiring large amounts of water. It is also an object of the present invention to provide a non-metallic trash rack that is as light weight as possible. Further, it is an object of the present invention to provide a non-metallic trash rack that will recover to substantially its original shape upon removal of a load of the type commonly associated with trash racks for large volume water intakes. Still further, it is an object of the present invention to provide a trash rack that will not fracture upon being impacted by debris or ice of the type associated with such systems.

These and other objectives are achieved in the present invention through the substitution of the prior reinforcing steel rods with rods that are sufficiently strong to withstand the loads expected, and flexible and elastic enough to give under the types of loads typically experienced by trash racks without fracturing. They are also sufficiently flexible to recover to substantially their original shape upon removal of such loading.

It was discovered that the introduction of a composite material including a fibrous material in a non-metallic material matrix as the reinforcing rod to replace the prior steel rod of the Pastore trash racks yielded a trash rack that was much better than expected, given the noted problem with the prior cast thermoset plastic reinforcing rod. Specifically, the reinforcing rod of the present invention is fabricated as a unitary piece using the technique known as pultrusion. The pultrusion process involves drawing a fibrous material such as glass, graphite, polyester, and the like, through a bath of the carrier matrix, which may be a resin such as isophthalic polyester or vinyl ester. Of course, those with knowledge of such compounds would be able to select similar materials suitable for the trash rack environment. After passing through the resin bath, the wetted fibers, which may be combined with a mat of the same or similar fibers prior to entering the resin bath, are pulled into a shaping unit. The shaping unit forms the wetted reinforcing material into a shape similar to that desired in the final product. From the shaping unit the preformed material is drawn into a heated die for final shaping. The die is heated so as to cure the resin system, thereby locking the fibrous material into the matrix in the final shape of the product desired. The surface of the finished product is quite smooth and the "locking in" of the fibrous material is so effective that delamination is of little to no concern.

5,922,195

3

It is to be noted that the pultrusion process is a known technique for fabricating materials of construction. However, prior to the present applicant's experimentation with various compositions of fibrous material and the carrier matrix, the use of a non-metallic material as the primary reinforcement component in a trash rack had been considered inappropriate. It was determined that the carrier material provided strength for the rod. The reinforcing material enhanced that strength and reduced the brittleness of the carrier. Of course, the carrier or resin material may include modifiers in the formulation so as to reduce the brittleness, although in doing so the likely reduction in structural strength must be considered.

The pultruded rod of the present improvement invention results in a non-metallic trash rack that is essentially metal free. It weighs much less than a rack of equivalent size containing a metal rod and is therefore much easier to maneuver. The viscoelastic characteristics of the pultruded rod enable it to give under loading without fracture. It also enables it to rebound from significant additional loading. Further, there is a reduction in vibration of such racks as compared to steel-reinforced racks. Experimentation has determined that the introduction of a pultruded rod has substantially improved the structural and weight characteristics of the prior Pastore trash rack. These and other advantages of the present invention will be apparent upon review of the following detailed description, the accompanying drawings, and the appended claims.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective exploded view of the trash rack of the present invention including the pultruded reinforcing rods.

FIG. 2 is a simplified diagrammatic view of a trash rack in place in front of a power-generating facility.

FIG. 3 is a cross-sectional view of a preferred design of the longitudinal elements of the trash rack of the present invention.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. 1 illustrates the components of a trash rack 1 of the present invention, which components are substantially the same as the components described in the Pastore patent. Specifically, the trash rack 1 includes a plurality of longitudinal elements 2 having ports 3 for receiving transverse support rods 4 designed to reinforce the longitudinal elements 2. Spacers 6, which may be selected of a specific width of interest in order to set the spacing between adjacent longitudinal elements 2, encircle the support rods 4, and are fabricated of a non-metallic viscoelastic material. Between the width of the longitudinal elements 2 and the width of the spacers 6, the rods 4 are essentially encapsulated when the trash rack is put together as shown in FIG. 2.

When the prior trash racks were formed with steel rods, it was essential that they be encapsulated in order to seal nucleation sites suitable for ice and marine growth. However, the present invention involves the fabrication of the rods 4 as pultruded rods, preferably formed with glass fibers in a vinyl-ester resin matrix, although a polyester resin may be used. The pultrusion process yields a very smooth rod surface that minimizes nucleation sites, unlike steel rods and unlike standard compression molding techniques for non-metallic materials. In addition, there is no possibility of corrosion of the pultruded rods 4, unlike with steel rods. Further, the materials used to form the pultruded rods 4 is

4

viscoelastic and has sufficient flexibility to ensure that it will substantially recover to its original shape after having been impacted by debris, or stress by tremendous water pressures, while supplying enough reinforcing strength to secure the trash rack 1 in place.

Continuing with the description of FIG. 1, at least rod ends 5 of the rods 4 are preferably threaded so as to receive washers 7 and securing nuts 8 that are used to lock all of the components of the trash rack 1 in place water 11 for positioning in front of a power-generating facility 10, as shown in FIG. 2. The washers 7 and the nuts 8, may be made of any suitable material, although they are preferably made of a non-metallic material such as, but not limited to, that used to make the longitudinal elements 2 or the rods 4.

As illustrated in FIG. 3, the longitudinal elements 2 are preferably formed with a hydrodynamic shape such that a leading edge 12, which is the first part of the trash rack 1 to be contacted by the incoming water 11, is radially shaped. A trailing edge 13 is preferably more sharply shaped such that there is minimal turbulence as the water passes through the trash rack 1. The leading edge 12 may be shaped with a radius in the range of about 0.15" to 0.25", and preferably about 0.19". The trailing edge 13 may be shaped with a radius in the range of about 0.01" to 0.125, and preferably about 0.06". For most trash rack applications the longitudinal elements 2 may be as long as suitable for the structural requirements of the particular location where they are installed. They may be about 4" in width and about 0.5" in thickness. As indicated in the Pastore patent, they may be formed of any non-metallic material of sufficient hardness, strength, and elasticity necessary to resist the large forces to which the trash rack 1 is exposed, and sufficiently smooth that ice-nucleating centers and marine-growth anchors are effectively absent on the surface of the trash rack 1 when in place. The materials suitable for fabrication of the longitudinal elements 2 include, but are not limited to, polyurethanes in the Shore D hardness range of 60–95, as well as polyethylenes, polypropylenes, and any other non-metallic viscoelastic materials having similar structural characteristics.

Although the present invention has been described with particular reference to the preferred embodiment, it is to be understood that alternatives and equivalents in materials, design and methods may be made without departing from the spirit and scope of the invention.

I claim:

1. A trash rack for filtering large volumes of water, the trash rack comprising:

   a. a plurality of longitudinal elements fabricated of a non-metallic material;

   b. non-metallic means for establishing lateral spacing between adjacent ones of said longitudinal elements;

   c. reinforcing rods for linking said longitudinal elements together in a parallel fashion to form a stable grid, wherein said reinforcing rods are pultruded rods fabricated of one or more non-metallic materials; and

   d. means for joining said longitudinal elements, said means for establishing lateral spacing, and said reinforcing rods together.

2. The trash rack as claimed in claim 1 wherein said reinforcing rods are fabricated of a combination of fiberglass reinforcement and a polyester resin matrix.

3. The trash rack as claimed in claim 1 wherein said longitudinal elements are fabricated of a hydrodynamic shape.

4. The trash rack as claimed in claim 3 wherein each of said longitudinal elements include a leading edge and a

5,922,195

5

trailing edge, wherein said leading edge is shaped with a radius in the range of about 0.15" to about 0.25".

**5.** The trash rack as claimed in claim **4** wherein said leading edge is shaped with a radius of about 0.19".

**6.** The trash rack as claimed in claim **5** wherein said trailing edge is shaped with a radius in the range of about 0.01" to about 0.125".

**7.** The trash rack as claimed in claim **6** wherein said trailing edge is shaped with a radius of about 0.06".

**8.** The trash rack as claimed in claim **1** wherein said means for joining said longitudinal elements, said means for

6

establishing lateral spacing, and said reinforcing rods together, includes a pair of washers and a pair of nuts securable to ends of said reinforcing rods.

**9.** The trash rack as claimed in claim **8** wherein said washers and nuts are fabricated of a non-metallic material.

**10.** The trash rack as claimed in claim **1** wherein said longitudinal elements are fabricated of polyethylene.

\* \* \* \* \*

JS 44
(REV. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
HOH Systems, Inc. d/b/a Hydrothane Systems

**DEFENDANTS**
Aftermarket Business Consultants d/b/a ABC, Inc.,
Robert Roy Cheesman, and
Hydro Component Systems, LLC

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Plymouth, MA
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    Waukesha, WI
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(C)** ATTORNEYS (FIRM NAME, ADDRESS AND TELEPHONE NUMBER)
Jason W. Morgan
Drohan, Hughes, Tocchio & Morgan, P.C.
175 Derby Street, Suite 30
Hingham, MA 02043

ATTORNEYS (IF KNOWN)

## 05 11059 RGS

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)    AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | Of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product Liability | ☐ 650 Airline Regs. | | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | | ☐ 660 Occupational | ☐ 820 Copyrights | |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | ☒ 840 Trademark | ☐ 850 Securities/Commodities/ |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | Exchange |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | | | 12 USC 3410 |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 730 Labor/Mgmt. Reporting | ☐ 865 RSI ( 405(g)) | ☐ 895 Freedom of |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | & Disclosure Act | | Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **HABEAS CORPUS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | | Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | or Defendant | State Statutes |
| | | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS — Third Party | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | Security Act | 26 USC 7609 | |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUES UNLESS DIVERSITY.)

Breach of contract; breach of covenant of good faith & fair dealing; misappropriation of trade secrets & confidential information; breach of loyalty & fiduciary duty; Quantum Meruit & unjust enrichment; unfair competition, false advertising & designation of origin; common law unfair competition and trademark infringement; infringement of U.S. Patent No. 4,846,966; infringement of U.S. Patent No. 5,922,195; tortuous interference with contracts and advantageous business relations; violation of M.G.L. c. 93A, §§2 and 11.

**VII. REQUESTED IN COMPLAINT:**
CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23
**DEMAND $** excess of $75,000
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ YES ☐ NO

**VIII. RELATED CASE(S)**
**IF ANY** (See instructions)
JUDGE _____    DOCKET NUMBER _____

DATE    May 20, 2005

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.    Title of case (name of first party on each side only)

_____HOH Systems, Inc. d/b/a Hydrothane Systems v. Aftermarket Business Consultants, Inc. d/b/a ABC, Inc., et als_____

2.    Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.
      (See Local Rule 40.1(A)(1)).

☐    I.     160, 410, 470, R.23, REGARDLESS OF NATURE
            OF SUIT.

☒    II.    195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710,        *Also complete AO 120 or AO 121
            720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890,          for patent, trademark or copyright cases
            892-894, 895, 950.

☐    III.   110, 120, 130, 140, 151, 190, 210, 230, 240, 245,
            290, 310, 315, 320, 330, 340, 345, 350, 355, 360,
            362, 365, 370, 371, 380, 385, 450, 891.


05 11059 RGS

☐    IV.    220, 422, 423, 430, 460, 510, 530, 610, 620, 630,
            640, 650, 660, 690, 810, 861-865, 870, 871, 875,
            900.

☐    V.     150, 152, 153.

3.    Title and number, if any, of related cases.  (See Local Rule 40.1(G)).  If more than one prior related case has been filed in
      this district please indicate the title and number of the first filed case in this court.

_____N/A_____

4.    Has a prior action between the same parties and based on the same claim ever been filed in this court?
                                                                        YES ☐    NO ☒

5.    Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?
      (See 28 USC § 2403)
                                                                        YES ☐    NO ☒
      If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
                                                                        YES ☐    NO ☒

6.    Is this case required to be heard and determined by a district court of three judges pursuant to Title 28 USC § 2284?
                                                                        YES ☐    NO ☒

7.    Do all of the parties in this action, excluding governmental agencies of the United States and the Commonwealth of
      Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division?
      (See Local Rule 40.1(D))
                                                                        YES ☒    NO ☐

      A.    If YES, in which division do all of the non-governmental parties reside?
            Eastern Division ☒          Central Division ☐          Western Division ☐

      B.    If NO, in which division do the majority of the plaintiffs or the only parties, excluding governmental
            agencies, residing in Massachusetts reside?
            Eastern Division ☐          Central Division ☐          Western Division ☐

8.    If filing a Notice of Removal – are there any motions pending in the state court requiring the attention of this Court?
      (If YES, submit a separate sheet identifying the motions)
                                                                        YES ☐    NO ☒

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME    Jason W. Morgan
ADDRESS    Drohan, Hughes, Tocchio & Morgan, P.C., 175 Derby Street, Suite 30, Hingham, MA 02043
TELEPHONE NO.    (781) 749-7200

## Marketing Agreement

This Agreement it made between HOH Systems, Inc (hereinafter called "HOH")
and Aftermarket Business Consultants Inc. (hereinafter called "ABC") on
8/27/97 .

## Scope of Agreement

HOH wishes to expand its sales and distribution network for its product and
services (Non-Metallic Bar Racks) in the United States, and desires to obtain the
services of ABC pursuant to this agreement and attached action plan.

Therefore it **is** agreed-

**Appointment as Agent.** HOH appoints ABC, as it's Marketing Representative
for its products and services for the United States. ABC accepts the appointment
and agrees to use it's best efforts to promote HOH products and services. HOH
grants ABC the right to use the HOH's trade name, trademark, service mark,
logo type, and advertisement in the promotion and sale of HOH's products. HOH
agrees to provide ABC with promotional sales material produced by HOH at no
cost to ABC.



**Payment.** HOH agrees to pay ABC a commission on all sales in the markets and
territories listed above. A sale is defined as collected revenue. The commission
is payable on a quarterly basis.
The payment shall include all sales of the prior quarter.
They will be paid on the 10th working day following the end of the quarter. The
commissions will be paid on the selling price of the product. For the purposes of
commissions, the selling price will not include taxes, transportation charges,
credits or other fees and expenses added to the invoice. The commission
amount is to be 4%.
The quarters end on the last day of March, June, September, and December.
HOH shall supply ABC a monthly list of open invoices on a monthly basis.

**Performance Targets.** It is anticipated that the additional marketing efforts of
ABC will increase business in the markets and territories listed above by
$600,000.00 12 months of this agreement. HOH is to provide the business levels
for the period of 12 months prior to the agreement.
It is anticipated that sales of $2,000,000.00 - $3,000,000.00 are obtainable in the
market and territories listed above.

**Independent Contractor.** Nothing contained in this agreement shall be
construed to constitute ABC as a partner, employee, or agent of HOH, nor shall
either party have any authority to bind the other in any respect, it being intended

that ABC shall remain on as an independent contractor responsible for his own actions. ABC shall be responsible for all his expenses, including, but not limited to, automotive expenses, insurance expense, unemployment compensation insurance, social security, federal, and state withholding taxes, sick leave benefits, and hospitalization and medical programs. ABC shall not be reimbursed for such expenses by HOH.

ABC will be reimbursed for any extraordinary expenses, which ABC and HOH will agree upon in advance.

**Restrictions.** During the term of this Agreement, and for two years thereafter ABC shall not at any time or in any manner disclose any confidential information of HOH. This includes but is not limited to trade secrets, costs, processes, and customers that are not readily discernable from public sources, or commonly known.

**Termination.** This Agreement shall continue for one year from July 1st, 1999 unless it is terminated at the option of either party upon 90 days written notification to either party or upon the death or incapacity of the ABC or its principal Robert R.Cheesman. Upon termination ABC will be entitled to commissions on sales for 180 days from termination date. ABC shall give to HOH all outstanding quotations made by ABC on the HOH's behalf.
The Agreement will renew on a year to year basis after the expiration of the initial period, unless written notification is made to either party 90 days prior to the renewal date.

Miscellaneous Terms.

> This Agreement contains the entire understanding of the parties and supercedes all previous agreements.
> No changes to this Agreement will be valid unless made in writing and signed by all parties.
  This Agreement shall be for the benefit and be binding upon all parties, their successors and assigns.
> The waiver by either party of non-performance or breach of any term of this Agreement shall not operate as a waiver of any continuing or subsequent breach.
> The provisions of this Agreement shall be interpreted under the laws of the state Massachusetts and shall be applied and interpreted in a manner consistent with each other so as to carry out the purpose and intent of the parties, but if for any reason any provision is unenforceable or invalid, such provision shall be deemed severed from the Agreement and the remaining provisions shall be carried out with the same force and effect as if that certain provision had not been part of this Agreement.

In Witness whereof, the parties have signed this Agreement as of the date and year first above written

HOH Systems

By: _____
Matt Brown
President

Aftermarket Business Consultants

By: _____
R. Roy Cheesman
President